Dena Kristi READ, Petitioner,

v.

The SCOTT FETZER COMPANY d/b/a
The Kirby Company, Respondent.

No. 97–0707.

Supreme Court of Texas.

Argued on March 5, 1998

Decided Dec. 31, 1998.

Rehearing Overruled June 10, 1999.

Bob E. Shannon, Tommy Jacks, James L. Wright, Austin, Richard Warren Mithoff, Houston, David Drew Wright, Williams Powers, Jr., Austin, Richard P. Hogan, Houston, for Petitioner.

P. Clark Aspy, Austin, David A. Kutik, Cleveland, OH, Robert C. Decarli, Austin, for Respondent.

Justice GONZALEZ delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice SPECTOR, Justice BAKER, and Justice HANKINSON joined.

A customer who was raped by a door-to-door vacuum cleaner salesman brought a negligence action against the manufacturer and the distributor, who operated as an independent contractor. Based on favorable jury findings, the trial court rendered judgment for the plaintiff for actual and punitive damages. The court of appeals affirmed the actual damages part of the judgment and reversed and rendered the punitive damages award. 945 S.W.2d 854. The question presented is whether a company that markets and sells its products through independent contractor distributors and exercises control by requiring in-home demonstration and sales, owes a duty to act reasonably in the exercise of that control. We hold that the company does owe such a duty. Accordingly, we affirm the court of appeals' judgment.

### I Facts

The Scott Fetzer Company d/b/a The Kirby Company ("Kirby") manufactures vacuum cleaners and related products. These products are sold only to independent distributors who are governed by a uniform distributor agreement. Each distributor is required to establish a sales force by recruiting prospective door-to-door salespeople called "dealers" for the

exclusive in-home demonstration, installation, sale, and service of Kirby Systems. Specifically, regarding noncommercial sales to the general public, the Kirby "Distributor Agreement" provides:

3. *Exclusively Consumer End–User Sales.* ... [A]ll Kirby Systems purchased by Distributor hereunder are purchased solely and exclusively for resale by in person demonstration to consumer end-users pursuant to [Kirby's] marketing system, unless [Kirby] otherwise expressly authorizes in writing. Distributor further agrees to use his best efforts to conduct the in person demonstration in the home of the consumer end-user.

...

A violation of the "Exclusively Consumer End–User Sales" provision will likely result in [Kirby] terminating this Agreement ... and/or taking any other action which it believes appropriate under the circumstances.

Further, regarding the in-home dealers, the "Kirby Independent Dealer Agreement" reads, in pertinent part, as follows:

3. Dealer fully understands that in order to protect and maintain The Kirby Company's trade name, reputation and competitiveness in the marketplace, Kirby Systems must be sold exclusively to consumer end-users by in-home demonstration.

4. Dealer certifies and agrees that any Kirby System consigned to Dealer will only be sold to consumer end-users after a personal demonstration which will be conducted in the home of the consumer end-user.

Additionally, Kirby enforces its contractual requirements through yearly reviews during which divisional supervisors verify that distributors are complying with the these requirements as well as others in the agreements.

In 1992, Leonard Sena, a Kirby distributor and owner of Sena Kirby Company of San Antonio (the "Sena Company"), recruited Mickey Carter to be one of his dealers. Carter's relationship with the Sena Company was that of an independent contractor subject to the "Kirby Independent Dealer Agreement," which required him, also, to sell Kirby systems to consumer end-users through in-home demonstrations.

In applying for employment, Carter listed three references and three prior places of employment. Had Sena checked, he would have found that women at Carter's previous places of employment had complained of Carter's sexually inappropriate behavior. Sena also would have found that Carter had been arrested and received deferred adjudication on a charge of indecency with a child, and that one of the previous employer's records indicated that Carter had been fired because of that incident. Further, Sena would have found that these records also contained witness statements, a confession, Carter's guilty plea, and the indictment charging him with the offense. Sena did not check.

Not long after being hired, Carter scheduled an appointment with Kristi Read for a demonstration. Before that scheduled appointment, Carter went to Read's home and met with her for several hours. He also brought doughnuts one morning, and then followed Read to a playground, where he spoke with her some more and played with her daughter. That afternoon, Carter returned to Read's home, where he sexually assaulted her.

Read and her husband sued Kirby, Sena, and Carter for negligence and gross negligence. The claims against Carter were nonsuited before trial. The trial court submitted the case to the jury with a broad form negligence question. The jury found the Sena Company and Read each ten percent negligent, and Kirby eighty percent negligent. The jury also found Kirby grossly negligent. The trial court rendered judgment against Kirby for $160,000 in actual damages and $800,000 in punitive damages.

The court of appeals affirmed the actual damage award. The court held that Kirby had a duty to take reasonable precautions to prevent the assault on Read due to the peculiar risk involved when a person with a history of crime, violence, or sexual deviancy conducts in-home sales. 945 S.W.2d at 868. The court also held that because Kirby required in-home demonstrations, the company exercised sufficient control over the sale of its products to end-users to justify imposing a duty of reasonable care in selecting the persons who performed the demonstrations. *Id.* Finally, the court of appeals reversed the punitive damage award, holding that there was legally insufficient evidence to meet the *Moriel* standard. *Id.* at 870; (citing *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994)). We affirm the court of appeals' judgment.

## II  Duty: Right of Control

Read's pleadings allege that Kirby has a "duty to take reasonable precautions to minimize the risk to its customers from coming into contact with Kirby dealers who have criminal and/or psychiatric records." Kirby and some of the amici curiae characterize Read's pleadings and arguments as seeking to impose vicarious liability on a general contractor for the torts of an independent contractor or as seeking to establish a master-servant relationship between Kirby and Carter. However, we understand Read's position to be that Kirby was negligent through its own conduct of creating an in-home marketing system without adequate safeguards to eliminate dangerous salespersons from its sales force. The duty is not based on a notion of vicarious liability, but upon the premise that Kirby is responsible for its own actions.

In *Redinger v. Living, Inc.,* 689 S.W.2d 415 (Tex.1985), we held that a general contractor, like Kirby, has a duty to exercise reasonably the control it retains over the independent contractor's work. Here, by requiring its distributors to sell vacuum cleaners only through in-home demonstration, Kirby has retained control of that portion of the distributor's work. Kirby must therefore exercise this retained control reasonably.

In concluding that Kirby must act reasonably, we require no more and no less than is required of other general contractors in similar situations. *See Redinger,* 689 S.W.2d at 418. We recognized the direct liability of a general contractor for failure to reasonably exercise the control it retained over an independent contractor when we adopted Section 414 of the Restatement (2d) of Torts. *Id.* Through its contract with Sena, Kirby retains control of specific details of the work by requiring the "in-home" sales of its vacuum cleaners.

Kirby argues that it owes no duty because it has successfully divorced itself from the independent dealers. Kirby notes that it has no contract with the dealers, only with the distributors. Moreover, Kirby's contract with its distributors provides that: "[Kirby] shall exercise no control over the selection of Distributor's ... Dealers.... The full cost and responsibility for recruiting, hiring, firing, terminating and compensating independent contractors and employees of Distributor shall be borne by Distributor."

Kirby also relies heavily on the fact that Read stipulated that Carter was an independent contractor. The stipulation provided that "[a]n independent contractor is a person who, in pursuit of an independent business, undertakes to do specific work for another person, *using his own means and methods* without submitting himself to the control of such other persons with respect to the details of the work, and who represents the will of such other person only as to the result of his work and not as to the means by which it is accomplished."

We do not question Carter's status as an independent contractor, but this status is not a defense to Read's claim. As previously noted, it is undisputed that Kirby directed its distributors that its Kirby vac-

uum cleaners be marketed solely through in-home demonstration. It was Kirby's retention of control over this detail that gave rise to the duty to exercise that control reasonably. That Kirby's agreement with the distributors allowed the distributors to independently contract with dealers does not excuse Kirby from the duty to act reasonably with regard to the detail—required in-home sales—over which it did retain control. *See Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex.1993) (noting that in determining whether duty exists in retained control case, focus is on whether retained control was specifically related to alleged injury).

Finally, Kirby (and various amici curiae) argues that if Kirby has a duty in this case, all companies or individuals that employ independent contractors will be subject to the same duty. As we noted earlier, Kirby misunderstands the claim Read is making. Read merely asserts that Kirby, having retained control over vacuum cleaner sales by requiring in-home demonstrations, has a duty to exercise its control reasonably. This is a well-established duty. *See Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 528 (Tex.1997); *Exxon Corp.,* 867 S.W.2d at 23; *Redinger,* 689 S.W.2d at 418; RESTATEMENT (SECOND) OF TORTS § 414 (1965).[1] Because Kirby did in fact retain control by requiring in-home sales, Kirby had a duty to exercise that retained control reasonably.

It has also been suggested that two other cases support the position that Kirby owed no duty in this case. In *Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287, 290 (Tex.1996), we held that the Boy Scouts of America owed no duty to screen the criminal history of adult volunteers.

In *Greater Houston Transportation Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990), we held that a cab company owed no special duty to admonish its cab drivers not to carry guns. These cases are inapposite. Neither involved any issue of retained control over specific aspects of the details of the work performed by an independent contractor. *See Golden Spread Council,* 926 S.W.2d at 290; *Phillips,* 801 S.W.2d at 526. Rather, we decided both cases solely on a straightforward common-law duty analysis, balancing the risk, forseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *See Golden Spread Council,* 926 S.W.2d at 289-90; *Phillips,* 801 S.W.2d at 525. By contrast, today's holding is premised on the duty emanating from Kirby's retained control over the details of the work. This duty derives solely from the retained control, not from any balancing analysis. *See Redinger,* 689 S.W.2d at 418.

### III  Breach of Duty

In the court of appeals, Kirby argued only that it did not have a duty. It did not challenge the jury finding of breach of duty. 945 S.W.2d at 868 n. 14. That issue is not before us, thus we express no opinion about it.

### IV  Proximate Cause

Kirby, however, does argue that no evidence or factually insufficient evidence supports the jury's finding that Kirby's negligence proximately caused Read's injuries. We do not have jurisdiction to

---

1. As an aside, we note *McLean v. Kirby Co.,* 490 N.W.2d 229 (N.D.1992). In *McLean,* Urie, a Kirby distributor, hired Molachek as a dealer. *Id.* at 232. Molachek had a history of violent crimes and was charged with sexual assault at the time he was hired. *Id.* Within a month of hire, Molachek raped Linda McLean. *Id.* Relying on the "peculiar risk" doctrine of Section 413 of the Restatement (2d) of Torts, the Supreme Court of North Dakota

upheld the judgment against Kirby. *Id.* at 242. As a result, Kirby has put warnings in its training manuals of the need to do a "thorough criminal background check" on potential dealer candidates, had discourse with some distributors about the need to do reference checks, and instructed that if "red flags" come up in the process, the distributors should do further background checks.

conduct our own factual sufficiency review, but we may ensure that the courts of appeals adhere to the proper legal standard of review. *See Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993) (stating that although this Court has no jurisdiction to determine factual sufficiency of evidence, we may determine whether intermediate appellate courts properly follow applicable legal standards). Because the court of appeals relied on the proper standard for its factual sufficiency analysis, Kirby's factual sufficiency argument is without merit.

■ Regarding the legal sufficiency of the evidence, we must determine if more than a scintilla of evidence supports the jury's affirmative finding of proximate cause. *See Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). Proximate cause consists of two elements: cause-in-fact and foreseeability. *Id.* at 118; *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). We therefore must examine the record to determine whether there is legally sufficient evidence to support an affirmative finding on each of these elements.

■ The cause-in-fact element of proximate cause is met when there is some evidence that the defendant's " 'act or omission was a substantial factor in bringing about injury' without which the harm would not have occurred." *Id.* (quoting *Prudential Ins. Co. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995)). Here, Sena testified that although he had not done a background check on Carter, he would have if Kirby had directed him to. There was evidence that Sena would have learned about Carter's past problems if he had performed a background check. Sena testified that he would not have hired Carter as a Kirby dealer if he had learned about Carter's history. We conclude that there is legally sufficient evidence to support a cause-in-fact finding.

■ The other element of proximate cause is foreseeability. In the context of proximate cause, foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Doe,* 907 S.W.2d at 478. Foreseeability in the context of causation asks whether an injury might reasonably have been contemplated because of the defendant's conduct. *Id.* Foreseeability does not permit simply viewing the facts in retrospect and theorizing an extraordinary sequence of events by which the defendant's conduct caused the injury. *Id.* Rather, the question of forseeability "involves a practical inquiry based on 'common experience applied to human conduct.'" Id. (quoting City of *Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex. 1987)); see also, e.g., *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992).

Sending a sexual predator into a home poses a foreseeable risk of harm to those in the home. Kirby dealers, required to do in-house demonstration, gain access to that home by virtue of the Kirby name. A person of ordinary intelligence should anticipate that an unsuitable dealer would pose a risk of harm. *See Doe,* 907 S.W.2d at 478. We hold that there is more than a scintilla of evidence that the risk of harm created by Kirby's in-home sales requirement was foreseeable.

## V Punitive Damages

The court of appeals held that there was legally insufficient evidence to support the gross negligence finding. 945 S.W.2d at 870. For the reasons stated in the court of appeals' opinion, we agree.

\* \* \* \* \*

For the above reasons, we affirm the court of appeals' judgment.

Justice HECHT filed a dissenting opinion, in which Justice OWEN joined.

Justice ABBOTT filed a dissenting opinion, in which Justice OWEN joined.

Justice HECHT, joined by Justice OWEN, dissenting.

To achieve what it considers to be a just result in this case—that the Kirby Company pay for a sexual assault committed by its independent contractor's independent contractor—the Court faces three obstacles. First, Kirby must somehow be found to have controlled its distributors' operations in a way that led to the assault, even though it contracted with them that it would "exercise no control" over their selection of dealers. Second, it must have been foreseeable to Kirby that a distributor might not check a dealer applicant's background if not required to do so and might mistakenly hire a person with a history of sexual misconduct who might assault a customer. The problem here is that in over eighty years of doing business, Kirby has had only one other dealer who sexually assaulted a customer, even though currently some 12,000 Kirby dealers make 1.5 million in-home demonstrations annually. While a risk may be improbable and still be foreseeable, just eight years ago in *Greater Houston Transportation Co. v. Phillips*,[1] an opinion also authored by JUSTICE GONZALEZ, the Court held as a matter of law that a Houston taxicab company whose drivers had had about 1,000 accidents annually during the twenty years it had done business could not reasonably foresee that if it did not forbid its drivers from carrying guns, they would do so, illegally, and would shoot other drivers in altercations following accidents. *Phillips* poses this question to today's Court: why is the risk that a vacuum cleaner salesman will turn out to be a sexual predator more foreseeable than the risk of cab driver "road rage" when it is at least a thousand times more likely that a Yellow Cab driver will shoot someone in an accident in Houston than it is that a Kirby vacuum cleaner salesman will assault a customer anywhere in the world? Third, the result in this case

must not seriously affect the wide range of direct sales and service businesses from Tupperware to television cable companies that employ independent contractors, something the Court has absolutely no desire to do.

The Court's solution is to limit its decision, as much as possible and well beyond what general principles will allow, to companies that require their products to be sold *exclusively* in customers' homes. A company that only *allows* its products to be sold in homes is unaffected, even if the risk to customers is the same. Today's "vacuum cleaner rule", carefully tailored and trimmed, is to apply in all cases exactly like this one, of which there appear to be none. In all other cases, the "taxicab rule" continues to apply, absent other sympathetic circumstances. Employing its chancery jurisdiction, the Court achieves a good result in this one case without adversely affecting the direct sales industry, the employment of independent contractors, or, it is hoped, anyone else at all. Today's decision is, to borrow Justice Roberts' metaphor, "a restricted railroad ticket, good for this day and train only."[2]

Both parties, on the other hand and to their credit, insist that this case is not unique and that it should be decided based on a neutral application of settled legal principles. I agree, and in my view, these principles require a different decision. Accordingly, I respectfully dissent.

I

Kristi Read suffered a terrible injury: she was sexually assaulted in the living room of her home by Mickey Carter, who was there ostensibly to demonstrate Kirby vacuum cleaners, which he sold. Carter was an independent contractor selected to be a Kirby "dealer" by Leonard Sena, a Kirby "distributor" who was himself an

1. 801 S.W.2d 523, 526–527 (Tex.1990).

2. *Smith v. Allwright*, 321 U.S. 649, 669, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (Roberts, J., dissenting) (quoted in *Dow Chem. Co. v. Alfaro*, 786 S.W.2d 674, 709 (Tex.1990) (Phillips, C.J., dissenting)).

independent contractor. The Kirby Company employed Sena. In addition to the criminal penalties already imposed on Carter, he is liable to Read under the civil law for her damages. But Read has sought compensation instead from Kirby.

It perhaps goes without saying that a determination whether Kirby is liable for Read's injury must be guided not by a goal of affording Read compensation, as desirable as that may be, but by generally applied principles of legal responsibility, basic among which is that individuals should be responsible for their own actions and should not be liable for others' independent misconduct. From this fundamental precept it follows that a person who employs an independent contractor must use reasonable care to select someone competent to do the work assigned[3]—that decision is the employer's—but is not ordinarily liable for the independent contractor's wrongful injury to another in the course of the assigned work.[4] If, however, the contractor is not truly independent, but rather the employer retains control over some aspect of the contractor's activities, then the employer may be liable in certain circumstances for its exercise of that control—its own conduct. We have adopted the statement of this "retained control" rule from the *Restatement (Second) of Torts* as follows:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.[5]

The basic notion of individual responsibility also dictates that "[a]s a rule, 'a person has no legal duty to protect another from the criminal acts of a third person.'"[6] Nevertheless, a person should not foster criminal conduct and thus may be liable for negligently creating a situation that affords another an opportunity to commit a crime if at the time the person "'realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a ... crime.'"[7] A person may be liable even if the situation he creates does not make criminal conduct probable, but the frequency of such conduct is a factor to be considered in determining whether it was foreseeable.[8]

No one questions that under these rules, Sena is liable to Read for failing to use reasonable care in selecting Carter as a competent dealer, as the jury found. Sena's application form required Carter to list employment references, which Carter did, and inquired whether the applicant

3. *Moore v. Roberts*, 93 S.W.2d 236, 238–239 (Tex.Civ.App.—Texarkana 1936, writ ref'd). *See King v. Associates Commercial Corp.*, 744 S.W.2d 209, 213 (Tex.App.—Texarkana 1987, writ denied) (citing *Jones v. Southwestern Newspapers Corp.*, 694 S.W.2d 455, 458 (Tex. App.—Amarillo 1985, no writ)); *Ross v. Texas One Partnership*, 796 S.W.2d 206, 216 (Tex. App.—Dallas 1990), *writ denied*, 806 S.W.2d 222 (Tex.1991) (per curiam). *See also* RESTATEMENT (SECOND) OF TORTS § 411 (1965).

4. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985); *Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 631 (Tex.1976); *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674, 675 (Tex.1964). *See also* RESTATEMENT (SECOND) OF TORTS § 409 (1965).

5. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985) (quoting RESTATEMENT (SECOND) OF TORTS § 414 (1965)).

6. *Timberwalk Apts., Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex.1998); *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Lefmark Management Co. v. Old*, 946 S.W.2d 52, 53 (Tex.1997). *See also* RESTATEMENT (SECOND) OF TORTS § 315 (1965).

7. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 550 (Tex.1985) (quoting RESTATEMENT (SECOND) OF TORTS § 448 (1965)).

8. *See Timberwalk Apts.*, 972 S.W.2d at 757–758.

had ever been convicted of a crime, to which Carter truthfully answered no. Sena did not check Carter's references, an omission for which he may be faulted because had he done so, he probably would have learned that although Carter sometimes got high marks on job performance, he had repeatedly been accused of sexually harassing fellow employees and others, and had pleaded guilty to a charge of indecency with a child, for which he received deferred adjudication.

If Sena were incompetent to act as a distributor, Kirby would be liable to Read if its failure to exercise reasonable care in selecting Sena proximately caused her injury. But Sena was not incompetent. In more than twenty years as a distributor, recruiting and training dozens of dealers who altogether had made something like 100,000 in-home demonstrations, Sena had never before had a complaint of dealer misconduct. His mistake in selecting Carter does not prove Sena incompetent. Read does not claim, nor could she do so successfully, that Kirby is liable to her for selecting Sena as a distributor.

Rather, Read claims that Kirby was negligent in not requiring its distributors to investigate potential dealers' criminal backgrounds. Read and Kirby take polar positions on how the relevant legal principles already stated apply to this claim, but they agree on one very important matter of process: the decision should turn on the neutral application of general rules and not on particularized corollaries adapted to the facts of this one case. Kirby argues that no special duty should be imposed on it, and Read strenuously insists that none is needed. To fashion a rule for the particular circumstances of this case, Read argues, would be an illegitimate exercise of appellate jurisdiction: "A *fact-specific* conclusion that a defendant did not have a 'duty' under the particular circumstances of an individual case would really just be a

finding that, given the facts, the defendant acted reasonably"—a decision for the fact finder, not an appellate court. Likewise, a fact-specific conclusion that a defendant *did have* a duty under the particular circumstances of an individual case would be no more than a finding that the defendant had acted unreasonably. In other words, a legal duty cannot legitimately be defined or applied to treat specific situations differently without a general, neutral reason for doing so. As Professor Wechsler once explained, "the main constituent of the judicial process is precisely that it must be genuinely principled, resting with respect to every step that is involved in reaching judgment on analysis and reasons quite transcending the immediate result that is achieved."[9]

Read and Kirby also agree that a decision for Read based on general principles will necessarily affect others in the direct sales industry as well as all who employ independent contractors. At oral argument Read's counsel acknowledged that, for example, the real estate sales industry would be impacted by this case, especially since realtors are often in people's homes. In amicus curiae briefs, newspapers who use independent contractors as distributors, apartment owners who use independent contractors as property managers, and others have warned of the potentially pervasive effects of a ruling in this case on many other activities. Products commonly sold in homes include cosmetics and personal articles (Avon and Mary Kay), home and kitchen wares (Amway and Tupperware), insurance, and encyclopedias.

To compensate Read without subjecting all these various enterprises to increased liability—although Read argues that they are already subject to such liability—the Court concludes that Kirby is different from other employers of independent contractors because it does not merely allow its distributors to conduct in-home dem-

**9.** Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV. L.REV. 1, 15 (1959).

onstrations, it contractually requires them to do so. While Kirby's in-home demonstration requirement is some exercise of control over its distributors, it is not, as I will endeavor to explain, the kind of control over the details of its distributors' operations that should make Kirby liable for their dealer selections while leaving other employers of independent contractors free of responsibility for similar employment decisions. This is especially true when Read concedes, and the Court tacitly recognizes, that Kirby could not practically monitor or otherwise exercise any meaningful control over dealer selection. Furthermore, no evidence suggests that Kirby's in-home sales requirement has significantly increased the risk of sexual assaults on its customers, nor has the Court even attempted to explain why it is foreseeable, as a matter of law, that door-to-door salesmen will sexually assault their customers but unforeseeable, again as a matter of law, that armed cab drivers will assault other drivers in an accident. Without a principled basis for distinguishing Kirby's operation from others, the Court's decision amounts to no more than an order that Kirby pay Read for her damages.

## II

To apply the "retained control" rule to the case before us, three questions must be answered: *first,* did Kirby retain control of Sena's work so as to be responsible for his dealers' torts? *second,* did Kirby owe Read a duty to exercise reasonable care to prevent her from being injured by Carter's criminal conduct? and *third,* was Read's injury caused by Kirby's failure to exercise its retained control with reasonable care? I address each in turn.

### A

Kirby does not select dealers itself, and as a practical matter it could not do so

without fundamentally altering the nature of its business. About 700 Kirby distributors employ some 12,000 dealers recruited from more than 50,000 annual applicants. Kirby's distributors, who are like Sena independent contractors, select the dealers. Kirby's contract with Sena plainly provided that Kirby "shall exercise no control over the selection of ... Dealers". Kirby had nothing to do with selecting Carter as a dealer. Practically and contractually, that was entirely Sena's responsibility.

Read argues, however, and the Court concludes that Kirby should have exercised some control over dealer selection because it required its products to be sold through in-home demonstrations. This requirement is too general to constitute a retention of control for liability purposes. For an employer to be liable for an independent contractor's actions, the employer must have retained not merely a "general right of control over operations" but control of " 'the details of the work to be performed' ".[10] An independent contractor ceases to be independent only when and to the extent that his employer assumes control for the details of the work.

> The employer must control not merely the end sought to be accomplished, but also the means and details of its accomplishment as well. Examples of the type of control normally exercised by an employer include when and where to begin and stop work, the regularity of hours, the amount of time spent on particular aspects of the work, the tools and appliances used to perform the work, and the physical method or manner of accomplishing the end result.[11]

Kirby exercised no such control over its distributors. With respect to dealer selection, it contractually eschewed any right of such control. Kirby's contractual requirement that its products be sold through in-home demonstrations merely defined the

---

**10.** *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex.1993). *See also Exxon Corp. v. Quinn,* 726 S.W.2d 17, 20 (Tex.1987).

**11.** *Thompson v. Travelers Indem. Co.,* 789 S.W.2d 277 (Tex.1990) (citations omitted).

nature of the work assigned to its distributors. Kirby did not control how its distributors went about that work. Kirby was entitled to choose the basic distribution system for its products without thereby incurring liability for the manner in which its distributors carried out the details of the work.

An employer is not liable for an independent contractor's misconduct merely because the employer knows of risk inherent in the assigned work. In *Golden Spread Council, Inc. v. Akins* [12] this Court held that Boy Scouts of America had no duty to monitor its local councils' selection of troop leaders,[13] even though BSA and its councils well knew that troop leaders were placed in a position to abuse the boys in their charge and tried to minimize the risk by maintaining a list of persons believed to be undesirable for those positions. BSA did not, of course, contractually require its local councils to mandate that troop leaders actually interact with boy scouts, but it had no need to do so; one cannot do the job of a troop leader without meeting with the boys. BSA was not responsible for the selection of an abusive troop leader merely because it set up the organization that allowed that risk to exist.

I cannot discern a principled reason for excusing BSA from any responsibility for sexual assaults by persons selected by its independent volunteer councils and not excusing Kirby from the same responsibility for its independent contractors' independent contractors. Each created an organization in which the risk of misconduct inhered. The Court imposed no duty on BSA, and none should be imposed on Kirby.

**B**

As already noted, Kirby owed Read a duty of reasonable care to prevent a dealer from sexually assaulting her only if it realized or should have realized the likelihood that it had created a situation in which such a tragedy might occur.[14] The Court simply assumes that in-house sales create an increased risk of sexual assault.

In *Greater Houston Transportation Co. v. Phillips* [15] we rejected the argument that the Yellow Cab Company in Houston should have known that it was likely a cab driver might carry a handgun with him while driving, get into an altercation with another driver, and shoot him. We explained:

> The record shows that Yellow Cab had been operating in the City of Houston for nearly twenty years and, in any given year, it is involved in approximately 1000 traffic accidents. During this period there was only one prior incident involving the use of a weapon and the driver in that case was exonerated of any wrongdoing.... We hold that as a matter of law, under these facts, that the cab company had no duty to warn its cab drivers not to carry guns.[16]

Kirby has conducted its business for over eighty years, more than four times as long as the Yellow Cab Company in Houston. Its 12,000 dealers make about 1.5 million in-home demonstrations annually, or 1,500 times the number of traffic accidents involving Yellow cabs in Houston. Kirby and the Yellow Cab Company in Houston have had the same number of incidents of criminal conduct: two. For Kirby, one was in North Dakota in 1983,[17] and the other in 1993 when Carter assaulted Read. I fail to see how, as a matter of law, it is unforeseeable that a cab driver will shoot another driver but foreseeable that a Kirby vacuum cleaner dealer will sexually assault a customer. I see no way to recon-

---

**12.** 926 S.W.2d 287, 290 (Tex.1996).

**13.** *Id.* at 290.

**14.** *See* note 7, *supra.*

**15.** 801 S.W.2d 523 (Tex.1990).

**16.** *Id.* at 526–527.

**17.** *McLean v. Kirby Co.,* 490 N.W.2d 229 (N.D.1992).

cile the holding in this case with *Phillips.* The Court says that *Phillips* did not involve an issue of retained control, and that is perfectly true, but it did involve an issue of foreseeability, just as the present case does.

More generally, there is no evidence in this record that door-to-door salesmen are more likely to sexually assault their customers than any other salesmen. The Direct Selling Association, as amicus curiae, cites statistics showing that many customers are acquainted with their direct sellers, either personally or through referrals. Such statistics are not surprising, since one might well surmise that most customers would be far more reluctant to admit strangers into their homes than they would be to approach strangers in the sales department of a store. But we need not go outside the record. The point is that there is nothing at all in the evidence before us to show whether the risk of sexual assaults in home sales organizations is greater than in other sales contexts.

A third party's criminal conduct need not be probable before a person may have a duty to protect others from it, but the infrequency of such conduct is a factor that must be considered in determining whether it was foreseeable. Several months ago, in *Timberwalk Apartments, Partners, Inc. v. Cain,*[18] we held in a related context that "[i]n determining whether the occurrence of certain criminal conduct on a landowner's property should have been foreseen, courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them."[19] Two sexual assaults is, of course, two tragedies too many. But the evidence in this record does not show that Kirby should have realized that if it did not require its

distributors to check dealer applicants' backgrounds, a sexual assault was a foreseeable consequence.

**C**

The third question is whether Read's injury was caused by Kirby's failure to exercise its retained control with reasonable care. Read argues repeatedly that all Kirby should have done differently was contractually obligate its distributors to conduct criminal background checks of all potential dealers. Read does not even contend that Kirby should monitor or enforce the obligation. Read's counsel was quite clear on the subject at oral argument:

COURT: So the sole argument that is being made here is the only thing that Kirby should have done, that it did not do, was as a part of its agreement with its distributor, the distributors would do background checks?

COUNSEL: That's correct. That that be required by the distributor.

COURT: ... But you are not requiring that Kirby do any background checks on the salespeople?

COUNSEL: That's correct. That's correct. That would be too burdensome and that would be unreasonable....

\* \* \*

COURT: And so all they [Kirby] needed to do was add one sentence to that contract?

COUNSEL: That's all they needed to do. They could xerox the copy and type it at the bottom.

\* \* \*

COURT: ... Don't they [Kirby] have an obligation to follow up?

COUNSEL: There is no suggestion in either [the North Dakota Supreme

18. 972 S.W.2d 749 (Tex.1998).

19. *Id.* at 757.

Court's opinion in *McLean v. Kirby Co.*[20] or the court of appeals' opinion in this case] that there was any continuing duty to monitor. And we would not so argue.

\* \* \*

COURT: ... [W]ouldn't they [Kirby] have some obligation to monitor and follow up to insure that their dealers are doing background checks?

COUNSEL: I think their duty would be very narrow. I think they could write a contract that said, "As a part of our agreement, you, distributor, are required to conduct a background check. Failure to conduct that background check, like the failure to conduct the sales in the way we deem appropriate ..."

COURT: But you would have to monitor to know that there was a failure. That's my question.

COUNSEL: I don't think there's a duty to monitor, is my answer....

\* \* \*

COURT: ... You say the only duty was, put a requirement in the contract that the distributor had a duty to do a background check.

COUNSEL: To actually do the check. Yes, Your Honor.

COURT: And that it did not—that Kirby did not—have the duty to monitor that for enforcement, but to enforce it if knowledge of the breach came to its attention.

COUNSEL: That's correct.

If Kirby's only duty was to add one sentence to its distributor agreements requiring them to check the backgrounds of potential dealers, without conducting any checks itself or monitoring the distributors operations for compliance, I fail to see how the breach of so ineffectual a duty could

possibly have resulted in Read's injury. Moreover, under settled law, Kirby's distributors already had a duty imposed by law to use reasonable care in selecting dealers.[21] A contractual requirement would add nothing.

Recognizing the plain flaws in Read's position, the Court does not endorse it, writing only that Kirby had a duty to "act reasonably"—whatever that means.[22] But if the Court intended to impose a duty greater than Read argued for, surely it would say so. If Kirby has a duty not only to require its distributors to make background checks of dealer applicants but to monitor and enforce that requirement, then its suggestion that Kirby has met its legal obligations by putting warnings in its distributor training manuals[23] is grossly misleading.

## III

Today's decision is, I believe, aberrational and therefore not of much concern. The Court tries as much as it can to prevent its decision from impacting the multitude of businesses similar to Kirby's. A decision aimed at a result may not be consequential, but result-directed decision-making is more serious. A Court that departs from settled principles in one case may do so in another. To return to Justice Roberts' analogy, no appellate court decision should turn out to be "a restricted railroad ticket, good for this day and train only"; certainly, no decision should be designed with such restrictions.

Under settled law, Read can obtain compensation for her injury from Carter and Sena only. Because the Court reaches a contrary result, I respectfully dissent.

Justice ABBOTT, joined by Justice OWEN, dissenting.

Kirby retained control over *where* the work was to be performed, not over *who*

---

**20.** 490 N.W.2d 229 (N.D.1992).

**21.** *See* note 3, *supra.*

**22.** *Ante* at 736.

**23.** *Ante* at 736 n. 1.

was to perform that work. Failure to require background checks of potential dealers relates to who is a dealer, not where the dealer works. As a result, the requisite relation between the control retained and the alleged injury is missing. Because the Court holds to the contrary, I dissent.

I agree with the Court's analysis of *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985), that "a general contractor, like Kirby, has a duty to exercise reasonably the control it retains over the independent contractor's work." 990 S.W.2d at 735. I also agree with the Court's synopsis of *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex.1993), that in determining whether a duty exists in a retained-control case, the "focus is on whether [the] retained control was specifically related to [the] alleged injury." 990 S.W.2d at 736. I disagree with the Court's application of this law to the relevant facts of this case.

As noted, Kirby's Distributor Agreement and Independent Dealer Agreement collectively require dealers to sell vacuum cleaners in the homes of potential customers. Kirby's contract with its distributors also provides that Kirby "shall exercise no control over the selection of ... Dealers. The full cost and responsibility for recruiting, hiring, firing, terminating and compensating independent contractors and employees of Distributor shall be borne by Distributor."

Ms. Read claims that her injury is related to the selection of Carter as a dealer without a background check. This injury is specifically related to the control that Kirby abrogated—control over the selection of dealers. In essence, the Court rewrites Kirby's Distributor Agreement and Independent Dealer Agreement to require Kirby to assume control over dealer selection. Because the injury is not related to the control retained by Kirby, the *Tidwell* test is not met and Kirby owed no duty to Ms. Read under the circumstances of this case.