OPINION

 

 

No. 04-08-00183-CV

 

MIDWEST EMPLOYERS
CASUALTY COMPANY

on Behalf of Terry
English,

Appellant

 

v.

 

Charles HARPOLE,
Jim Carroll, Alan Kwast, 

Albert Lopez, and
Brock Pittman,

Appellees

 

From the 57th Judicial
District Court, Bexar County, Texas

Trial Court No. 2008-CI-01410
(Severance from Trial Court No. 2006-CI-16714)

Honorable David A.
Berchelmann, Jr., Judge Presiding

 

Opinion by:     Rebecca Simmons, Justice

 

Sitting:            Catherine
Stone, Chief Justice

                        Karen
Angelini, Justice

                        Rebecca
Simmons, Justice

 

Delivered and
Filed:  June 24, 2009 

 

AFFIRMED

 

This
appeal stems from the entry of a summary judgment, in favor of Appellees
Charles Harpole, Jim Carroll, Alan Kwast, Albert Lopez, and Brock Pittman
(collectively the Referees), based on the lack of duty owed to Brackenridge
High School Coach Terry English.  Because the Referees established, as a matter
of law, that there was no genuine issue of material fact as to one of the
essential elements of Midwest Employers Casualty Company’s (Midwest’s) claims,
and Midwest failed to bring forward a scintilla of probative evidence to raise
a genuine issue of material fact, we affirm the judgment of the trial court.[1] 

Statement of Facts

While
officiating at a football game at Alamo Stadium, referee Charles Harpole ran
into Brackenridge High School assistant football coach Terry English who sustained
a serious head injury.  According to the rules adopted by the San Antonio
Independent School District (SAISD), a fifty-yard long and six-foot wide
restricted area is designated in the middle of each sideline for the referees
to use during live play.  More specifically, the rule prohibits both coaches
and players from being in the officials’ box while the ball is in active play.[2]  The rule allows the referees, specifically
the line officials such as Harpole, to follow the play and mark the ball, by
running unimpeded in a restricted area, free from encroachment by others.  Immediately
behind the restricted area is a six-foot wide region available for the coaches’
use and designated as the “Coaching Box.”  



During
the third quarter of the game, Referee Harpole, the head linesman for the game,[3] ran south down the restricted area
and directly into the back of Coach English.  All of the parties agree that the
collision occurred in the restricted area of the field.  When Harpole collided
with English, Harpole’s head slammed into the back of English’s head.  English
lost consciousness and fell to the ground.  English suffered Grade 3 brain
injury and is permanently disabled.  

Midwest
filed suit and the Referees filed a general denial contending that they owed no
duty to English, and that even if they owed him a duty, there was no evidence
of a breach of that duty.  Following over a year of discovery, the Referees
filed a traditional motion for summary judgment and a no-evidence motion for
summary judgment based on lack of duty.  The trial court granted both motions on
September 18, 2007, and this appeal followed.

Standard of Review

Midwest
argues that summary judgment was improperly granted in favor of the appellees
because Harpole was under a duty to act as a reasonable prudent person as he officiated
the game, and that more than a scintilla of evidence was presented that Harpole,
in particular, breached that duty by running “more aggressive[ly] than normal,”
“at full speed,” and “faster than normal” without looking where he was going
when he knew there were people in the area.  Additionally, Midwest argues the
Referees were under a duty to enforce the rules of the game, and that it
presented more than a scintilla of evidence that the Referees breached that
duty by permitting, and actually encouraging, coaches like English to work in
the restricted area when the Referees knew it was dangerous.  When a trial
court’s order granting summary judgment does not specify the ground or grounds
relied on for the ruling, as is the case here, the “summary judgment will be
affirmed on appeal if any of the theories advanced are meritorious.”  State
Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993).

A. 
Traditional Motion for Summary Judgment

We
review a trial court’s grant of a traditional motion for summary judgment de
novo.  Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 156 (Tex. 2004).
 The standard of review for a traditional summary judgment is well established:
(1) the movant must show “that there is no genuine issue of material fact and
that it is entitled to judgment as a matter of law; (2) in deciding whether
there is a disputed material fact issue precluding summary judgment,” the court
must take evidence favorable to the non-movant as true; and (3) the court must
indulge every reasonable inference in favor of the non-movant and resolve any
doubts in the non-movant’s favor.  Am. Tobacco Co. v. Grinnell, 951 S.W.2d
420, 425 (Tex. 1997) (citing Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d
546, 548-49 (Tex. 1985)); see also Joe, 145 S.W.3d at 157 (“When
reviewing a summary judgment, we take as true all evidence favorable to the
nonmovant, and we indulge every reasonable inference and resolve any doubts in
the nonmovant’s favor.”). 

B.  No-Evidence
Motion for Summary Judgment

“A
no-evidence summary judgment is essentially a pretrial directed verdict,” to
which an appellate court applies a legal sufficiency standard of review.  King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003); accord Wal-Mart
Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002).  We view the
evidence in the light most favorable to the non-movant and disregard all
contrary evidence and inferences.  King Ranch, 118 S.W.3d at 751; Moore
v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet.
denied).  When a party moves for summary judgment under Rule 166a(i), asserting
that no evidence exists as to one or more elements of a claim on which the non-movant
would have the burden of proof at trial, the burden is on the non-movant to
present more than a scintilla of probative evidence to raise a genuine issue of
material fact on each of the challenged elements.  See Tex. R. Civ. P. 166a(i); Ford Motor
Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004); Wal-Mart, 92 S.W.3d
at 506.  “Less than a scintilla of evidence exists when the evidence is ‘so
weak as to do no more than create a mere surmise or suspicion’ of a fact.”  King
Ranch, 118 S.W.3d at 751 (quoting Kindred v. Con/Chem, Inc., 650
S.W.2d 61, 63 (Tex. 1983)).  More than a scintilla of evidence exists if it “would
enable reasonable and fair-minded people to differ in their conclusions.”  King
Ranch, 118 S.W.3d at 751 (quoting Merrell Dow Pharms. Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997)).  A no-evidence summary judgment motion should
be denied if the non-movant brings forth more than a scintilla of probative
evidence on each challenged element of his claim.  Tex. R. Civ. P. 166a(i); see Wal-Mart, 92
S.W.3d at 506.




 

Question of Duty

Midwest
argues that more than a scintilla of evidence existed regarding the breach of
duty by the Referees.  In order to determine whether evidence of a breach
existed, we must first examine the parameters of the duty, if any, owed by the
Referees to English.  Specifically, Midwest asserts that the Referees owed a
duty to keep English from encroaching into an area restricted to the officials’
use; and further, that Harpole, in particular, owed English a duty to keep a
careful, forward lookout for coaches within the restricted area, while
simultaneously watching the ball on the field during live play.  Midwest relies
on: (1) the Restatement (Second) of Torts section 323; and (2) the common law
duty to exercise reasonable care to avoid the foreseeable risk of injury to
support the existence of the duty owed to English.

A. 
Negligence Cause of Action

Midwest’s
underlying claim against the Referees is based on negligence.  There are three
essential elements to a negligence cause of action: (1) a legal duty owed by
one person to another; (2) a breach of that duty; and (3) damages proximately
resulting from that breach.  Praesel v. Johnson, 967 S.W.2d 391, 394
(Tex. 1998); Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472,
477 (Tex. 1995).  To prevail on a claim “for negligence, the plaintiff must
establish the defendant had a legal duty.”  DeGrate v. Executive Imprints,
Inc., 261 S.W.3d 402, 409 (Tex. App.—Tyler 2008, no pet.) (citing Graff
v. Beard, 858 S.W.2d 918, 919 (Tex. 1993)).  “[T]he existence of [a] duty
is a question of law for the court to decide from the facts surrounding the occurrence
in question.”  Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523,
525 (Tex. 1990); accord Way v. Boy Scouts of Am., 856 S.W.2d 230,
233 (Tex. App.―Dallas 1993, writ denied).  

A
duty is a legal obligation that requires the defendant to conform to a certain
standard of conduct.  See Way, 856 S.W.2d at 233.  “Every person has a
duty to exercise reasonable care to avoid a foreseeable risk of injury to
others.”  Lukasik v. San Antonio Blue Haven Pools, Inc., 21 S.W.3d 394,
403 (Tex. App.―San Antonio 2000, no pet.) (citations omitted).  The
Referees contend that no duty exists regarding a risk inherent in the sport of
football.  

B.  New
Arguments on Appeal

            Before
we address the parties’ contentions, we must address Midwest’s argument that
the Referees did not raise their inherent risk argument in their motions for
summary judgment before the trial court and therefore, the argument may not be
considered on appeal.  “A motion for summary judgment must itself expressly
present the grounds upon which it is made, and must stand or fall on these
grounds alone.”  Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 912
(Tex. 1997) (citations omitted); see also Tex. R. Civ. P. 166a(c) (“The motion for summary judgment
shall state the specific grounds therefor.”); Tex.
R. App. P. 33.1(a) (“[T]he record must show that . . . the
complaint was made to the trial court by a timely request, objection, or motion . . . ”). 
Trial courts may not grant a summary judgment on grounds not presented, Johnson
v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 204 (Tex. 2002), and we may
not affirm a summary judgment on grounds “not expressly set out in the motion
or response.”  Stiles v. Resolution Trust Corp., 867 S.W.2d 24, 26 (Tex.
1993).  

Midwest
asserts that, before the trial court, the Referees’ sole argument was that the
accident was one-hundred percent English’s fault.  The Referees, on the other
hand, contend their argument was that they owed no duty to English,
encompassing a global duty, and more specifically denied that a referee has a
duty to a coach in the context of a sporting event.  As characterized by
Midwest in its brief: “[T]he Referees presented two arguments in support of
their motion: (1) the traditional/legal argument that they owed English no
duty; and (2) the no-evidence/factual argument that even if they did owe
English a duty, they committed no breach.”  

            Although
the Referees’ motions for summary judgment do not expressly raise “the risk
inherent in the sport of football,” it is clear from the context of the motions
that the Referees’ argument was that they owed no duty and
breached no duty to English.  We, therefore, conclude that this argument
encompassed the duty of a referee toward a football coach during live play in a
football game, and particularly the circumstances from which the injury arose
including the inherent risks of sporting events.[4]


C.  Parties’
Assertions Under Restatement (Second) of Torts Section 323

Midwest asserts that the facts surrounding this case call for the
application of section 323 of the Restatement (Second) of Torts.  By adopting section
323, Midwest argues the Texas Supreme Court confirmed its longstanding view
that “one who voluntarily undertakes an affirmative course of action for the
benefit of another has a duty to exercise reasonable care that the other’s
person or property will not be injured thereby.”  Colonial Sav. Ass’n v. Taylor,
544 S.W.2d 116, 119 (Tex. 1976); accord Torrington Co. v. Stutzman,
46 S.W.3d 829, 838-39 (Tex. 2000) (adopting Section 323 Restatement (Second) of
Torts).  Section 323 of the Restatement (Second) of Torts provides:

One who undertakes,
gratuitously or for consideration, to render services to another which he
should recognize as necessary for the protection of the other’s person or
things, is subject to liability to the other for physical harm resulting from
his failure to exercise reasonable care to perform his undertaking, if 

 

(a) his failure to
exercise such care increases the risk of such harm, or 

 

(b) the harm is
suffered because of the other’s reliance upon the undertaking.

 

Restatement (Second) of Torts § 323
(1965).  

According
to Midwest, section 323 applies when the person providing the services, in this
case Harpole and the other referees, recognizes that their service is necessary
for the protection of coaches such as English.  Midwest argues section 323 applies
to Harpole’s failure to exercise reasonable care when he ran down the sideline
full speed without looking where he was going.  See Restatement (Second) of Torts
§ 323 (1965).  Moreover, Midwest contends that English’s injuries were a
result of Harpole’s “failure to exercise reasonable care to perform his
undertaking.”  Id.  Furthermore, in accordance with section 323’s
requirement that the actor’s failure to exercise reasonable care “increases the
risk of such harm,”  Midwest claims the evidence shows Harpole specifically did
not watch where he was going even after “glancing off” another person during
his run down the sideline.  

The
Referees counter that courts have not applied section 323 in the context of
injuries in a sporting event, and that Harpole owed no negligence duty to English
regarding a risk inherent in the sport of football.  Even if the Referees owed
a duty to exercise reasonable care, the appellees argue there is no evidence
the Referees failed to exercise reasonable care in performing their duties as
officials.  

D.  Analysis
Under Section 323

In
this case, Midwest argues that Harpole had a duty to prevent the harm that
occurred to English.  “Texas law generally imposes no duty to take action to
prevent harm to others absent certain special relationships or circumstances.”  Stutzman,
46 S.W.3d at 837.  A duty, however, may arise when a person undertakes to
provide services to another either gratuitously or for compensation.[5]  Allegations of a breach of such
undertaken duties are often referred to as negligent undertakings claims.  

[T]o establish a
claim for a negligent undertaking, a plaintiff must show (1) the defendant
undertook to perform services that it knew or should have known were necessary
for the plaintiff’s protection, (2) the defendant failed to exercise reasonable
care in performing those services, and either (3) the plaintiff relied upon the
defendant’s performance, or (4) the defendant’s performance increased the
plaintiff’s risk of harm.  

 

Pugh v. Gen.
Terrazzo Supplies, Inc., 243 S.W.3d 84, 94-95 (Tex. App.—Houston [1st Dist.]
2007, pet. denied) (citing Stutzman, 46 S.W.3d at 838); accord Tex.
Woman’s Univ. v. The Methodist Hosp., 221 S.W.3d 267, 284 (Tex.
App.―Houston [1st Dist.] 2006, no pet.); see also Restatement (Second) of Torts
§ 323 (1965).  Thus, under a negligent undertakings claim, Midwest was
required to provide at least some evidence that (1) Harpole undertook to perform
services that he knew were necessary for English’s protection, (2) Harpole
failed to exercise reasonable care in providing those services, and (3) English’s
reliance on Harpole’s actions increased the risk of harm to English.[6] 

The
Referees contend that sporting events, with their inherent risks, should not be
analyzed under a negligent undertakings construct.  However, assuming without
deciding that a negligent undertakings analysis is appropriate, we believe the
Referees established, as a matter of law, that there was no evidence that
Harpole failed to exercise reasonable care in refereeing the game thus
precluding a negligence claim under section 323.  

The
summary judgment evidence established that Harpole ran down the sideline at
full speed without looking where he was going.  Midwest claims that this is
sufficient to raise a fact issue on failure to use reasonable care.  However,
we cannot review this evidence without considering the services being provided
by Harpole.  The evidence is also undisputed that Harpole was in the midst of
refereeing a play, running down the designated referee restricted area, and
performing the services for which he had been retained by SAISD.  There is no
evidence that English’s injuries were a result of an improper application or
violation of the NCAA rules which govern Harpole’s provision of services.  

The
fact is that Harpole was where he was supposed to be, doing exactly what
his job required.  For Harpole to perform the essential functions of his duties
as a linesman referee, while the ball was in play, he had to focus on the
football field and not look for coaches inside the restricted area.  The rules
governing both coaches and referees require a safe zone for the referee to
perform his service in a safe manner.  Relying on these rules, Harpole, or a
reasonable person performing the duties of a linesman, would not have anticipated
the encroachment by English.  We, therefore, conclude that Harpole’s failure to
foresee English’s presence in the restricted area is not some evidence of
Harpole’s failure to exercise reasonable care.  Thus, Midwest failed to present
any evidence of a necessary element of a negligent undertaking claim—Harpole’s
failure to exercise reasonable care in providing his services.

E.  Common
Law Duty

Midwest
next argues that the Referees owed a duty under the common law to English to
exercise reasonable care while officiating high school football games, and that
the Referees breached that duty by negligently permitting and encouraging the
coaches to stand in an area of the field that the Referees knew or should have
known was dangerous.  The Referees strongly object to this characterization of
the evidence.  

1. 
Risk-Utility Balancing Test

Appellate
courts apply a risk-utility balancing test in determining whether a duty exists
under common law.  See Read v. Scott Fetzer Co., 990 S.W.2d 732, 736
(Tex. 1998).  In determining whether a common law duty exists, an appellate
court considers the risk, foreseeability, and likelihood of injury, and then
weighs these factors “against the social utility of the actor’s conduct, the magnitude
of the burden of guarding against the injury, and the consequences of placing
the burden on the defendant.”  Id.; accord Avalos v. Brown
Auto. Ctr, Inc., 63 S.W.3d 42, 47 (Tex. App.—San Antonio 2001, no pet.).

The
“foremost and dominant consideration” in determining whether a defendant owes a
duty to act reasonably is foreseeability of the risk, that being what a person
should, under the circumstances, reasonably anticipate as a consequence of her
conduct.  See Tex. Home Mgmt., Inc. v. Peavy, 89 S.W.3d 30, 36 (Tex.
2002); Garcia v. Cross, 27 S.W.3d 152, 155-56 (Tex. App.—San Antonio
2000, no pet.).  “Foreseeability means that a person who possesses ordinary
intelligence should have anticipated the danger that his negligent act would
create for others.”  Garcia, 27 S.W.3d at 156; Boys Clubs, 907
S.W.2d at 478.  “In the absence of foreseeability, there is no duty.”  NationsBank,
N.A. v. Dilling, 922 S.W.2d 950, 954 (Tex. 1996).  

“When
a duty requires the defendant to exercise reasonable care, the defendant’s
standard of care is defined as what a ‘reasonable prudent person’ would or
would not have done ‘under the same or similar circumstances regarding any
reasonably foreseeable risk.’”  Allen ex rel. B.A. v. Albin, 97 S.W.3d
655, 666 (Tex. App.—Waco 2002, no pet.) (quoting Colvin v. Red Steel Co.,
682 S.W.2d 243, 245 (Tex. 1984)).  Foreseeability alone, however, is not
sufficient to create a duty.  Golden Spread Council, Inc. v. Akins, 926
S.W.2d 287, 290-91 (Tex. 1996).  Ultimately, the test boils down to “what a
person should, under the circumstances, reasonably anticipate as the
consequences of one’s action or failure to act.”  Lukasik v. San Antonio
Blue Haven Pools, Inc., 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2000, no
pet.).  Therefore, Midwest had to show that the Referees did not act as
“reasonable prudent persons” would have acted in the same or similar
circumstances.  See id.

2. 
Analysis

            a. 
The Referees’ Duty

Midwest
argues the Referees breached a duty to enforce the rules to prohibit coaches
from intruding into the restricted area.  The Referees testified the NCAA rules
were designed, in part, to keep the players, coaches, and officials safe. 
Moreover, the summary judgment evidence supports Midwest’s argument that the services
for which the Referees were hired included ensuring the safety of all of the
participants, including the sideline observers and the officials.  Based on the
evidence, Midwest argues that a reasonable person of ordinary intelligence,
acting as a referee in a high school football setting, would have anticipated the
danger to the participants created by failing to enforce the rules as adopted
by the school district.  See Doe, 907 S.W.2d at 478.  Thus, according to
Midwest, the Referees were under a duty to enforce the rules as prescribed by
the NCAA.  Assuming without deciding such a duty existed in the context of a
sporting event, we must determine whether there is any evidence the Referees
breached this duty.

Midwest
relies on the statement of Brackenridge High School Head Coach Willie Hall for
the proposition that the referees allowed or encouraged the coaches to use the
restricted area during the game in question, in violation of the rules.  A closer
examination of the testimony, however, reveals that Coach Hall’s statement does
not support Midwest’s position.

Well, before every
ball game, [the Referees] always say “Coaches, keep your coaches back so we can
work that area.  You guys can work in and out of that area, but that is the
officials[’] area.”  So when he’s running the sideline, everybody needs to be
clear.  That’s been a point of emphasis the last couple of years because I
believe there was an accident, maybe a couple of years ago, that now they’re
making that a point of emphasis. 

 

It is undisputed
that the rules permit the coaches and others to enter the restricted area when
the ball is not in play.  The foregoing statement does not, however, support
the contention that the Referees breached their duty by granting English, or
the other coaches, permission to move into the restricted area during “live
play.”

Furthermore,
Midwest’s summary judgment evidence actually supports the absence of a breach
of duty, rather than a breach.  Midwest relies on evidence of the Referees
continually instructing the coaches and players to stay clear of the restricted
area.  One referee testified that he gave verbal warnings “pretty much every
play.  It’s always something that we do every play.”  This evidence does not
support the conclusion that coaches freely entered the restricted area without
repercussions.  To the contrary, this evidence, combined with Coach Hall’s
statement, reinforces Midwest’s lack of evidence that the Referees breached
their duty on the day in question.  Midwest simply failed to present any
evidence to substantiate a breach of the alleged duty owed by the Referees. 
We, therefore, overrule Midwest’s issue with regard to the Referees.

            b. 
Harpole’s Duty

Midwest
further argues that Harpole, individually, owed a duty to English to keep a
lookout for anyone encroaching into the restricted area.  The very purpose for
the restricted area is so that the game referees can run unimpeded down the
sidelines, with their heads turned toward the game in progress, without concern
that someone is standing within the identified “safe zone.”  Although Harpole testified
that he was running a little “more aggressive[ly] than normal” or a little
faster than usual due to another referee’s injuries, the fact remains that he
was running up and down the sidelines, in a restricted space, while the ball
was in play, exactly as his job duties required and the rules allowed.  In
determining whether a duty existed, we consider the risk, foreseeability, and
likelihood of injury.  Read, 990 S.W.2d at 736.  There is no evidence in
the record that Harpole should have foreseen that a coach would violate the
rules implemented for his own safety and encroach on the restricted area.  Moreover,
as discussed above, Harpole was performing the essential functions of his
duties as a linesman referee, in a restricted area, while the ball was in
play.  As such, he was required to focus on the football field and not look for
coaches, or other individuals, inside the restricted area.  We conclude that a
reasonable person of ordinary intelligence in Harpole’s position would not have
anticipated the danger of injury to English.  Accordingly, the record does not
substantiate the existence of a duty, based on the common law, owed by Harpole to
English.[7]
 See Lukasik, 21 S.W.3d at 403 (recognizing the duty of every
person to exercise reasonable care to avoid foreseeable risk of injury to
others).  Thus, this issue is overruled.

Conclusion

Because
the Referees established, as a matter of law, that there was no genuine issue
of material fact as to one of the essential elements of Midwest’s claims, and
Midwest failed to bring forward a scintilla of probative evidence to raise a
genuine issue of material fact on an element for which it bears the burden of
proof, we affirm the judgment of the trial court.  

 

Rebecca Simmons, Justice









[1] 
Midwest provides worker’s compensation insurance for SAISD and compensated
Coach Terry English for lost wages and medical benefits.  Additionally, due to
his permanent disability, English will continue to receive these benefits
indefinitely.  Thus, pursuant to chapter 417 of the Texas Labor Code, Midwest
Employers Casualty Company filed suit as subrogee of Terry English against the
Referees seeking to recover for English’s injuries.  See Tex. Labor Code Ann. §§ 417.001-.003
(Vernon 2006) (“An employee or legal beneficiary may seek damages from a third
party who is or becomes liable to pay damages for an injury or death . . . . 
[T]he insurance carrier is subrogated to the rights of the injured employee and
may enforce the liability of the third party in the name of the injured
employee or the legal beneficiary.”  Id. § 417.001(a)-(b)).  





[2]  The
NCAA Rules governing Texas high school football provide: 

Article 5.a:        While the ball is in play,
coaches, substitutes and authorized attendants in the team area may not be
between the sideline and the coaching line.

 

Article 1.b.1:     During the game, coaches,
substitutes and authorized attendants in the team area shall not be on the
field of play or outside the 25 yard lines without permission from the referee
unless legally entering or leaving the field.  Team area personnel who are
outside the team area and who have involvement or impact on line or ball play
are subject to penalty.

 

 





[3] 
The linesman is responsible for marking the ball.  At the time of the accident,
Harpole was running along the sideline to mark the ball after the opposing team
punted the ball.





[4]
We note that the Referees rely on Chrismon v. Brown, 246 S.W.3d 102 (Tex.
App.—Houston [14th Dist.] 2007, no pet.), for their arguments regarding
inherent risk of sporting events, and that case was issued after the motions
for summary judgment were filed.





[5] 
This concept is often associated with Good Samaritan cases.  Stutzman,
46 S.W.3d at 837.





[6] 
Midwest’s argument under section 323 is directed toward Harpole’s actions.





[7]
Because we hold there is no duty owed by Harpole, we need not address the
breach of duty arguments.  See Tex.
R. App. P. 47.1 (encouraging concise opinions addressing only those
issues “necessary to final disposition of the appeal”).