6-96-028-CV Long Trusts v. Dowd 













In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00160-CV


______________________________





IN RE: DANIEL ELLIS TAYLOR








 
 

Original Mandamus Proceeding







 
 



Before Morriss, C.J., Grant and Ross, JJ.

Opinion by Justice Ross



O P I N I O N


 Daniel Ellis Taylor, a prisoner at the McConnell Unit in Beeville, Texas, filed a
petition for writ of mandamus against the Honorable Robert E. Newsom, trial judge for the
8th Judicial District Court of Hopkins County, Texas. Specifically, Taylor asks us to direct
Judge Newsom to conduct an evidentiary hearing or rule on Taylor's motion to withdraw
his plea agreement. Taylor has informed this Court that he pled guilty March 21, 1995, to
intentionally and knowingly causing the death of Colten Thomas O'Hara, a child younger
than six years of age. Pursuant to a plea agreement, the trial court sentenced Taylor to
fifty years in prison. 

 At the outset, we note that Taylor's motion to withdraw his guilty plea, filed more
than seven years after the plea, amounts to a collateral attack on his conviction. Such
challenges are properly brought under Tex. Code Crim. Proc. Ann. art. 11.07 (Vernon
Supp. 2002). We shall therefore consider the underlying motion as an application to the
trial court for habeas corpus relief. If we considered the motion merely a post-trial
challenge to the plea's voluntariness, the trial court would not err by denying his motion
without a hearing because the lower court would lack jurisdiction to consider its merits. 
See Tex. R. App. P. 21.4, 22.3. 

 The courts of appeals have limited jurisdiction to issue writs of mandamus. We may
issue a writ when necessary to enforce this Court's jurisdiction. Tex. Gov't Code Ann.
§ 22.221(a) (Vernon Supp. 2002). We may also issue writs of mandamus "agreeable to
the principles of law regulating those writs" against a district or county court judge within
our appellate district. Tex. Gov't Code Ann. § 22.221(b)(1) (Vernon Supp. 2002). 
However, courts of appeals have no jurisdiction over post-conviction writs of habeas corpus
in felony cases. Bd. of Pardons & Paroles ex rel. Keene v. Court of Appeals for the Eighth
Dist., 910 S.W.2d 481, 483 (Tex. Crim. App. 1995); Ater v. Eighth Court of Appeals, 802
S.W.2d 241, 243 (Tex. Crim. App. 1991); In re McAfee, 53 S.W.3d 715, 717 (Tex.
App.-Houston [1st Dist.] 2001, orig. proceeding). Such jurisdiction lies exclusively with the
Texas Court of Criminal Appeals. Tex. Code Crim. Proc. Ann. art. 11.07, § 5 (Vernon
Supp. 2002). Accordingly, we may not consider Taylor's claims. 

 We dismiss the petition for want of jurisdiction.



 Donald R. Ross

 Justice



Date Submitted: October 2, 2002

Date Decided: October 3, 2002


Do Not Publish



ll." + WPid + ".style.visibility = 'hidden'" );
}



















In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00076-CV
______________________________


RON GABRIEL AND LANA GABRIEL, Appellants
 
V.
 
 CLYDE LOVEWELL, Appellee


                                              

On Appeal from the 294th Judicial District Court
Van Zandt County, Texas
Trial Court No. 99-00629


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross
Dissenting Opinion by Justice Carter


O P I N I O N

          Ron Gabriel and wife, Lana, horse farm owners, appeal from a judgment on a jury
verdict in favor of Clyde Lovewell, horse owner, based on Lovewell's allegations of
negligence and breach of implied warranty in connection with the death of a filly in the
Gabriels' care. The jury awarded damages of $10,075.00 plus prejudgment interest of
$4,372.27, court costs of $4,446.22, and attorney's fees of $40,000.00, totaling $58,893.49
plus postjudgment interest. Although Lovewell also alleged conversion and use of false,
misleading, or deceptive trade practices, the jury limited his recovery to the allegations of
negligence and breach of implied warranty. On appeal, the Gabriels contend that, because
Lovewell failed to present expert testimony, there is legally and factually insufficient
evidence to establish the causation element of each cause of action. We conclude the
evidence is legally and factually sufficient and affirm the trial court's judgment.
I.        FACTUAL AND PROCEDURAL HISTORY
A.       Summary and Background
          In 1998, pursuant to contract, Lovewell bred his mare, Shappas Delight, with the
Gabriels' stallion, Clu Heir. The mare gave birth in February 1999 to a filly, whose death
is the subject of this appeal. 
          In March 1999, Lovewell took Shappas Delight to the Gabriel Quarter Horse Farm
so she could be bred to Clu Heir again. The filly went with its mother. While there, the filly
would be weaned from her mother, and offers would be fielded for the filly's sale. Although
apparently healthy when she arrived at the Gabriels' farm, she became ill very shortly after
she was weaned, displaying symptoms of pneumonia and experiencing an elevated
temperature and diarrhea.
          On Saturday, July 24, 1999, Ron called William Gilbert, a veterinarian and partner
at the Winnsboro Veterinary Clinic, to come to the farm to look at the sick filly. Gilbert went
to the farm and ordered medication and fluids be administered to the filly. The parties
dispute what instructions Gilbert left with the Gabriels that day. On Monday, July 26, 1999,
the filly's condition worsened and Lana called David Howton, also of the Winnsboro
Veterinary Clinic and the primary veterinarian who had been caring for the Gabriels' horses
for ten to twelve years. Howton advised Lana to bring the filly to the clinic, which Lana did
at approximately 5:30 p.m. Lana testified this trip to the clinic from their horse farm takes
approximately one hour and fifteen minutes. Although the filly was able to walk onto the
trailer—with assistance—when she left the Gabriels' farm, she was unable to stand or walk
by the time she arrived at the clinic and was in very poor condition. She died at
approximately 8:30 p.m.


 Renal failure caused by endotoxemia, stemming from colitis, was
diagnosed as the cause of the filly's death.
 
 
B.       July 19–23 Treatment by the Gabriels
          When the filly began suffering from respiratory problems and diarrhea, and before
Gilbert's visit to the horse farm, the Gabriels administered the following medications to the
horse: Rebound, Naxcell, Erythromycin, and Banamine. 
          1.       Rebound 
          Rebound, according to Ron's testimony, is a generic form of Probios, apparently an
over-the-counter treatment for diarrhea. Neither Gilbert nor Howton were familiar with
Rebound. Ron conceded he did not contact a veterinarian regarding this treatment,
likening it to a human taking Pepto-Bismol. 
          2.       Naxcell
          Naxcell is an antibiotic with which the Gabriels were treating the filly before Gilbert's
visit on Saturday. Neither veterinarian ordered the use of Naxcell. Gilbert did order the
Gabriels to continue giving the filly Naxcell, in addition to other medication and fluids. The
evidence does not indicate that Naxcell could have caused or contributed to the horse's
symptoms. 
          3.       Erythromycin
          Erythromycin is another antibiotic often used by the Gabriels when a horse develops
a respiratory infection. Howton testified this drug is "very prone to cause diarrhea." Gilbert
also confirmed this common side effect. 
          Ron testified he does not give antibiotics to a horse without a doctor's order to do
so. Specifically, he testified he does not give Naxcell or Erythromycin without a
veterinarian's orders. Ron explained that, on this occasion, he must have noted the filly's
elevated temperature and called the clinic and was told to "[p]ut it on Erythro." Howton
testified that clients do not usually need to call about treating respiratory problems with
Erythromycin. 
          Although Ron testified that one of the veterinarians must have prescribed
Erythromycin for the sick filly, both doctors deny having ordered it. Additionally, all parties
deny there was a standing order for the Gabriels to use Erythromycin when a horse
experienced respiratory problems. Howton testified, however, that Erythromycin is the
"standard protocol" on the Gabriel farm to treat a foal with respiratory problems.           Gilbert testified Erythromycin would probably have been appropriate to give to this
filly. He also testified that it was good that the filly was taken off Erythromycin and that the
Gabriels were directed to discontinue its use. Howton agreed that use of Erythromycin was
indicated under these circumstances, at least until the filly suffered from diarrhea.           4.       Banamine
          Banamine is an anti-inflammatory medication given to treat an elevated
temperature. Both Gilbert and Howton testified that use of Banamine would have been
appropriate here, where the horse was in decent shape overall, but its temperature spiked. 
Gilbert's records, however, indicate he did not prescribe Banamine for this filly. Howton
testified it is "possible" he (Howton) ordered it. He admitted that Banamine can cause
colitis, but further testified, "It's also the treatment of choice." He stated that an evaluation
of the benefits and side effects of Banamine is a balancing act that a veterinarian must
consider before administering it. Veterinarian consultation before use, however, is vital,
especially when a horse is dehydrated. This special concern is due to the fact that
Banamine is excreted through the kidneys and can, therefore, lead to renal problems. 
Uremia is one of those complications and is one which this filly suffered. 
C.       Gilbert's July 24 Visit and His Instructions to the Gabriels
          Gilbert testified the filly was in "pretty good shape" during his visit on Saturday. He
directed the Gabriels to discontinue use of Erythromycin. He ordered them to continue
giving Naxcell, and he added Gentamycin, another antibiotic, to the horse's treatment. He
also ordered that the horse be given fluids. Finally, he maintains he instructed the Gabriels
to contact the clinic if the horse's condition did not improve. 
          Both doctors testified it is preferable in many cases to treat a foal at its location as
long as the facilities and help are adequate. They added it is stressful for a foal to be
transported during the extreme East Texas summer heat. Gilbert testified he instructed
the Gabriels to call the clinic if the horse did not improve as far as eating, drinking,
responding to medication, and temperature decreasing. 
D.       July 25 and 26 Before the Filly's Transport to the Clinic
          Ron testified they followed Gilbert's instructions regarding the horse's treatment.
Gilbert testified he did not give the Gabriels a choice as to whether the horse should
receive the medication ordered. According to the Gabriels' note cards, however, there is
no indication they gave the horse any medication on Sunday, July 25. 
E.       Transport to Clinic on July 26
          Lana called the clinic when the filly 's condition worsened and her breathing became
labored and rapid. Howton directed her to bring the horse to the clinic because it sounded
as though the filly was in serious condition. He testified that he is able to run laboratory
tests at his clinic more efficiently and that he relies on laboratory results to give thorough
care in these instances. He further testified that, when the filly arrived at the clinic late that
Monday, she was already "trying to die" and, although he administered several fluids and
medications, he was unable to save her.
F.       Medical Cause of Death
          Despite Howton's efforts, the filly died two to three hours after arriving at the clinic. 
According to Howton, the horse died from renal failure brought about by complications from
endotoxemia resulting from Colitis X. Colitis X is the term used for the rapid onset of
colitis, an inflammation of the large intestine.
          Howton testified to the many causes of Colitis X. He said that, "[a]ccording to the
so-called experts," the cause of colitis can only be determined approximately twenty
percent of the time. Antibiotic and anti-inflammatory medication are two of the many
causes of Colitis X. Both doctors testified that no act or omission of the Gabriels caused
the death of the horse. 
G.       Events Following the Death of the Filly
          The morning following the filly's death, her body was picked up by a stock removal
company, processed, and ground into greyhound food. Lovewell was not notified of this
arrangement and did not consent to disposal in such a manner.


 
H.       Lovewell's Allegations
          Lovewell brought suit against the Gabriels, alleging sixteen specific theories of
negligence. He alleged the Gabriels were negligent by the following acts or omissions: 
1) failing to have a trailer to transport the sick horse; 2) failing to provide proper supervision
and care for the horse; 3) failing to provide care that was represented to be given but, in
fact, was not; 4) providing medication to the horse without authorization; 5) administering
improper medication to the horse; 6) failing to adequately hydrate the horse;
7) administering medication to the horse without knowledge of its side effects; 8) failing to
have proper equipment to care for the horse; 9) failing to properly supervise employees
that cared for the horse; 10) allowing the horse to become dehydrated; 11) allowing the
horse to become dehydrated and administering medication that had not been prescribed
by the Gabriels' veterinarians; 12) failing to take the horse to a place where proper care
could have been given, even though requested to do so by the Gabriels' own veterinarian;
13) transporting the horse when it was not safe to do so; 14) failing to seek immediate
treatment for the horse when it had diarrhea and pneumonia; 15) failing to properly wean
the horse; 16) lacking the basic knowledge to allow them to properly care for the horse. 
Lovewell also alleged breach of an implied warranty to render services in a good and
workmanlike manner. 
I.        Lovewell's Testimony on Conversation with Howton
          1.       Previous Attempts To Get Hearsay Testimony into Evidence
          On two occasions, Lovewell attempted to introduce testimony regarding statements
Howton made to him. First, Lovewell tried to introduce this testimony through his friend,
Lee Barton, who was present with Lovewell and Howton at the clinic during the
conversation in question. Second, Lovewell tried to introduce his own testimony
concerning the conversation between himself and Howton. Both times he argued that the
statements were admissible as statements by an agent of a party opponent. See Tex. R.
Evid. 801(e)(2)(D). Both times, the trial court disallowed the testimony. 
          2.       The Gabriels Open the Door
          The Gabriels then elicited the following testimony on direct examination of Howton:
Q.Do you remember, Dr. Howton, having any conversations with
Mr. Lovewell after the filly died?
 
A.Yes, sir.
 
Q.What do you remember about those?

                     A.       Very little.
 
Q.Okay. Do you remember telling Mr. Lovewell that the filly died
because it wasn't brought in soon enough?

                     A.       No.
 
Q.Do you remember telling Mr. Lovewell the filly died because of
something Ron and Lana Gabriel did or did not do?

                     A.       No.

          At this point, Lovewell argued the Gabriels opened the door to the previously-rejected testimony regarding the telephone conversation.
          3.       Rebuttal Testimony Allowed
          Outside the presence of the jury, the trial court agreed the Gabriels' direct
examination of their witness on his memory of conversations with Lovewell opened the
door to Lovewell's testimony about what Howton said to him during that conversation. The
Gabriels again urged their objection to the testimony as hearsay. The trial court overruled
the objection. The jury was returned, and Lovewell was permitted to testify on rebuttal that
Howton attributed the death of the horse to the Gabriels' failure to bring it to the clinic
sooner: 
Q.I want to take you back in time to when you went to the clinic
and spoke with Dr. Howton. Do you understand what I'm asking you about?
 
A.Okay.
 
Q.Did you have a conversation with Dr. Howton -- 

                     A.       I did.
 
Q.-- at the clinic? Did you talk to him about his opinions and his
expressions about your horse that day when you first went up there?
 
A.Yes, sir.
 
Q.Did he provide you his opinions and his thoughts about why
your horse died?

                     A.       Yes, sir.

                     . . . . 
 
Q.What did he tell you?

                     . . . .
 
A.When he walked in, he shook hands with me and he said, "This
is a bad, bad deal. This should never have happened."
 
Q.Did he say why?
 
A.. . . . He said, "We had a vet out there Saturday. We wanted
to bring him to the clinic, gave the fluids, Ron Gabriel said he didn't have a
trailer, so he didn't bring it."
 
Q.Did you ask him whether or not that would have made a
difference, in his opinion?
 
A.Yes, sir.
 
Q.What did he say?
 
A.I said, "If he had brought it in there Saturday, would the horse
have died," and he said "No."
 
Q.Did you ask him about Sunday?
 
A.I did.
 
Q.What did he say?
 
A.He said, "He would have brought it in Sunday, it would have
had a lot better chance."
 
Q.Did you ask him about Monday?
 
A.Yes, sir.
 
Q.What did he say?
 
A."If it had been brought in Monday morning, it would have had
a lot better chance."

          4.       The Door Was Opened to Hearsay 

          "Opening the door" or inviting testimony that would otherwise pertain to an
inadmissible subject matter does not mean that such testimony is necessarily invited into
evidence in any form, including hearsay.


 However, where such testimony pertains to the
same subject matter and is directly contrary to earlier testimony, it is admissible, including
hearsay.


 In the instant case, Lovewell's testimony pertained to the same subject matter
as did Howton's testimony and was directly contrary to Howton's testimony.


 This evidence
was clearly admissible for the limited purpose of impeaching Howton's earlier testimony. 
The trial court properly admitted it over the Gabriels' hearsay objection. 
J.       Jury's Findings
          Although Lovewell alleged sixteen specific theories of negligence, the jury charge
properly included only one broad question on negligence: "Did the negligence, if any, of
those persons named below proximately cause the occurrence in question?" The charge
went on to define "negligence" and "proximate cause." The jury answered yes as to both
Ron and Lana. The jury also found that the Gabriels failed to comply with a warranty and
that such breach was the producing cause of Lovewell's loss. 
II.       SUBSTANTIVE LAW
A.       Proximate Cause, Producing Cause Compared
          Negligence requires a showing of proximate cause, while producing cause is the test
when alleging a breach of an implied warranty. Tex. Bus. & Com. Code Ann. § 17.50(a)(2) 
(Vernon 2002); Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 502 (Tex. 2001); Read v.
Scott Fetzer Co., 990 S.W.2d 732, 737 (Tex. 1998); Cont'l Dredging, Inc. v. De-Kaizered,
Inc., 120 S.W.3d 380, 391 (Tex. App.—Texarkana 2003, pet. denied). Proximate cause
and producing cause differ in that foreseeability is an element of proximate cause, but not
of producing cause. Read, 990 S.W.2d at 737; Parkway Co. v. Woodruff, 857 S.W.2d 903,
914 (Tex. App.—Houston [1st Dist.] 1993), modified on other grounds & aff'd, 901 S.W.2d
434 (Tex. 1995). 
B.       Proximate Cause
          Proximate cause consists of both cause in fact and foreseeability. Read, 990
S.W.2d at 737. Cause in fact means that the defendant's act or omission was a
substantial factor in bringing about the injury which would not otherwise have occurred. 
Purina Mills, Inc. v. Odell, 948 S.W.2d 927, 936 (Tex. App.—Texarkana 1997, writ denied). 
The cause-in-fact element of proximate cause is met when there is some evidence that the
defendant's "'act or omission was a substantial factor in bringing about injury' without which
the harm would not have occurred." Read, 990 S.W.2d at 737.
          Foreseeability, in the context of proximate cause, requires that a person of ordinary
intelligence should have anticipated the danger created by a negligent act or omission. Id. 
Foreseeability in the context of causation asks whether an injury might reasonably have
been contemplated because of the defendant's conduct. Id. Foreseeability does not
permit simply viewing the facts in retrospect and theorizing an extraordinary sequence of
events by which the defendant's conduct caused the injury. Id. Rather, the question of
foreseeability "involves a practical inquiry based on 'common experience applied to human
conduct.'" Id.
          Foreseeability requires only that the general danger, not the exact sequence of
events that produced the harm, be foreseeable. Walker v. Harris, 924 S.W.2d 375, 377
(Tex. 1996). When causation facts are disputed, causation may be established by
circumstantial or direct evidence. McMillen Feeds, Inc. v. Harlow, 405 S.W.2d 123, 130
(Tex. Civ. App.—Austin 1966, writ ref'd n.r.e.). The plaintiff need not exclude every other
possibility. Comty. Pub. Serv. Co. v. Dugger, 430 S.W.2d 713, 719 (Tex. Civ.
App.—Texarkana 1968, no writ). All that is required is proof of a causal connection beyond
the point of conjecture or mere possibility. Lenger v. Physician's Gen. Hosp., 455 S.W.2d
703, 706 (Tex. 1970). 
C.       Producing Cause
          A producing cause is "an efficient, exciting, or contributing cause, which in a natural
sequence, produced injuries or damages complained of, if any." Roberts v. Healey, 991
S.W.2d 873, 878 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Common to both
proximate and producing cause is causation in fact, including the requirement that the
defendant's conduct be a substantial factor in bringing about the plaintiff's injuries. Id. 
However, producing cause requires a lesser burden than proximate cause because it does
not require foreseeability.
III.      ANALYSIS
          The Gabriels contend expert testimony was necessary to aid the jury on the element
of causation in this case. They argue that, without such testimony, legally and factually
insufficient evidence supports the causation element to support the judgment against the
Gabriels for negligence or breach of implied warranty. 
A.       Necessity of Expert Testimony
          A jury may decide the required causal nexus between the event sued upon and the
plaintiff's injuries when 1) general experience and common sense will enable a layperson
to fairly determine the causal nexus; 2) expert testimony establishes a traceable chain of
causation from injuries back to an event; or 3) expert testimony shows a probable cause
nexus. Weidner v. Sanchez, 14 S.W.3d 353, 370 (Tex. App.—Houston [14th Dist.] 2000,
no pet.). In this case, many of the circumstances surrounding the cause of the filly's death
were matters within the jury's common understanding. The jury was further aided by the
Gabriels' own experts' testimony in concluding there was a probable cause nexus between
the Gabriels' acts or omissions and the filly's demise. As Lovewell asserts, this is not a
veterinary malpractice case; the veterinarians were not the defendants. The acts and
omissions of Ron and Lana must be the focus of our analysis.
B.       Scope and Force of Lovewell's Hearsay Testimony
          1.       No Limiting Instruction Requested
          The Gabriels were entitled to a limiting instruction concerning Lovewell's hearsay 
testimony contradicting Howton's earlier testimony. The Rules of Evidence allow such an
instruction to the jury when evidence is admitted for a limited purpose. Tex. R. Evid. 105. 
It is incumbent on the opponent of the evidence to request such an instruction. In the
absence of a request by the opponent, the trial court's failure to instruct the jury cannot be
a ground for complaint on appeal. Tex. R. Evid. 105. Here, the Gabriels did not request
the trial court give the jury a limiting instruction regarding the purpose of this impeaching
testimony by Lovewell, and the trial court did not give one, either at the time the testimony
was given or in the court's charge to the jury. We must now assess the impact of
Lovewell's testimony in light of the absence of a limiting instruction. 
          2.       Without Instruction, Testimony Was Considered for Any and All                      Purposes

          This Court has held that evidence admitted without limitation comes into evidence
for any and all purposes. Cigna Ins. Co. v. Evans, 847 S.W.2d 417, 421 (Tex.
App.—Texarkana 1993, no writ). In Evans, a document was offered into evidence for a
limited purpose. The document was admitted over Cigna's hearsay objections. The
document was then read in its entirety to the jury, but no instruction was requested or given
to restrict the jury's consideration of the document to a limited purpose. Id. On appeal,
Cigna claimed the document was admitted only for a limited purpose, but this Court found
that assertion was not supported by the record. Id. We noted that the document was read
in its entirety to the jury; that the court did not state it was admitting the document for a
limited purpose, nor did it so instruct the jury; and that counsel for Cigna did not request
such an instruction or object to its absence. Id. at 421. This Court held that, "In the
absence of any directive to the fact finder to consider a piece of evidence only for a limited
purpose, the fact finder may consider it for any and all purposes." Id.
          The Austin court relied on Evans to reach a similar conclusion when evidence was
admitted without a limiting instruction. See Owens-Corning Fiberglas Corp. v. Keeton, 922
S.W.2d 658, 660 (Tex. App.—Austin 1996, writ denied).


 Most recently, the Amarillo court
relied on Evans to reach a similar conclusion. First United Bank v. Panhandle Packing &
Gasket, Inc., No. 07-04-0039-CV, 2005 Tex. App. LEXIS 1995, at *15–16 (Tex.
App.—Amarillo Mar. 16, 2005, no pet. h.).


 
          Criminal cases have arrived at similar conclusions with respect to evidence admitted
without a limiting instruction. When confronted with impeaching evidence admitted without
limitation, the Texas Court of Criminal Appeals plainly held that "once evidence is received
without a proper limiting instruction, it becomes part of the general evidence in the case
and may be used as proof to the full extent of its rational persuasive power." See Garcia
v. State, 887 S.W.2d 862, 878 (Tex. Crim. App. 1994) (citing 1 Edward W. Cleary et al.,
McCormick on Evidence 4th Ed. § 54 (1992)); see also Hammock v. State, 46 S.W.3d 889,
892 (Tex. Crim. App. 2001). The Fourteenth court, likewise, held that, if impeaching
evidence is admitted without a limiting instruction, it becomes part of the general evidence
and may be considered for all purposes. See Arana v. State, 1 S.W.3d 824, 829 (Tex.
App.—Houston [14th Dist.] 1999, pet. ref'd).
          The rationale behind this rule is clear: We cannot burden the jury with the task of
limiting its consideration of certain items of evidence when, although the evidence may
have been intended to have a limited purpose, the limitation was never communicated to
the jury. "Jurors cannot be expected to know exactly how to use the evidence unless we
tell them, nor can we guarantee that they will 'remain open-minded until the presentation
of all of the evidence and instructions.'" Hammock, 46 S.W.3d at 893–94 (citing Rankin
v. State, 974 S.W.2d 707 (Tex. Crim. App. 1996)).
          3.       Hearsay Testimony Can Support Judgment
          We also rely on another rule of evidence to arrive at our holding that Lovewell's
testimony was before the jury for any and all purposes. Even as inadmissible hearsay,
once into evidence without limitation, then it may support a judgment. Hearsay statements
are not "incompetent" evidence and, therefore, may support a judgment, whereas
speculative and conclusory expert testimony will not. Coastal Transp. Co. v. Crown Cent.
Petroleum Corp., 136 S.W.3d 227, 232 n.1 (Tex. 2004); Olympic Arms, Inc. v. Green,
No. 01-02-00781-CV, 2004 Tex. App. LEXIS 11825, at *20 n.7 (Tex. App.—Houston
[1st Dist.] Dec. 30, 2004, no pet.).
          4.       Testimony Was Not Conclusory
          Coastal Transport also brings another issue into our consideration. While hearsay
testimony is not incompetent and may support a judgment, speculative and conclusory
expert testimony will not. A statement of an expert witness that had no facts to support the
expert's conclusions is insufficient to create a question of fact because it is not credible or
susceptible to being readily controverted. McIntyre v. Ramirez, 109 S.W.3d 741, 749 (Tex.
2003); Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 122 (Tex. 1996). Coastal Transport
stands for the proposition that such evidence is incompetent and cannot support a
judgment. The Gabriels rely on Coastal Transport's holding to argue that Howton's
statements embedded within Lovewell's testimony are conclusory and, thus, incompetent. 
They also contend such statements do not constitute expert testimony as defined by Rule
of Evidence 702.


 
          Even if Howton's statements to Lovewell do not qualify as expert testimony under
Rule 702, such statements included a factual basis and had probative value. The record
shows that Gilbert, Howton's partner at the clinic, had been called to the Gabriels' farm on
Saturday, July 24, to treat the ailing horse. The record further shows that, on that day,
Lana had taken the farm's trailer out of town to a horse show and their trailer was therefore
not available to transport the horse to the clinic. Howton testified that he had been a
practicing veterinarian for several years and that he provided a great deal of veterinary care
for the Gabriels' quarter horse farm. More specifically, Howton testified he treated the filly
on the day it died. He also testified the horse was severely dehydrated on its arrival at the
clinic. There is ample factual basis in the record for Howton's statements to Lovewell.
C.       Sufficiency of the Evidence
          We hold that Lovewell's testimony was before the jury for any and all purposes and
now turn to a review of the entire record with this in mind.
          1.       Standards and Scope of Review
          When both legal and factual sufficiency issues are raised, the court should review
the legal sufficiency first to determine whether there is any probative evidence to support
the jury's verdict. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981). 
                     a.       Legal Sufficiency Review
          We consider all the evidence in the light most favorable to the jury's verdict,
indulging every reasonable inference of the prevailing party. Associated Indem. Corp. v.
CAT Contracting, Inc., 964 S.W.2d 276, 285–86 (Tex. 1998). A point challenging the legal
sufficiency of the evidence will be sustained only when 1) there is a complete absence of
evidence of a vital fact, 2) the court is barred by rules of law or evidence from giving weight
to the only evidence offered to prove a vital fact, 3) the evidence offered to prove a vital
fact is no more than a scintilla, or 4) the evidence conclusively establishes the opposite of
a vital fact. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). 
                     b.       Factual Sufficiency Review
          In a factual sufficiency review, we must consider all the evidence in the case in a
neutral light to determine whether the jury's verdict is so against the great weight and
preponderance of the evidence as to be manifestly unjust. Lofton v. Tex. Brine Corp., 720
S.W.2d 804, 805 (Tex. 1986). 
          2.       Legally Sufficient Evidence
          Because Lovewell's hearsay testimony carries full probative force, the jury could rely
on that testimony for causation. To support this conclusion, there is also testimony, as
noted above, that Lana was out of town at the time and that she had with her the farm's
horse trailer. Therefore, we cannot conclude there is a complete absence of a vital fact. 
Additionally, as we have discussed in detail, the Rules of Evidence do not prevent us from
giving weight to Lovewell's testimony concerning what Howton told him. Failure to have
a trailer to transport the sick horse and failure to take the horse to a place where proper
care could be given were specific acts of negligence alleged by Lovewell against the
Gabriels, and this evidence specifically supports those allegations.
          Likewise, we cannot conclude that this record conclusively establishes the opposite
of a vital fact. The opinion testimony of expert witnesses, even though not contradicted by
an opposing expert, is generally held not to be binding on the trier of fact if more than one
possible conclusion can be drawn from the facts. Gregory v. Tex. Employers Ins. Ass'n,
530 S.W.2d 105, 107 (Tex. 1975); Exxon Corp. v. West, 543 S.W.2d 667, 672 (Tex.
App.—Houston [1st Dist.] 1976, writ ref'd n.r.e).


 Even when the subject matter of the
expert's testimony is such that the trier of fact must be guided solely by the opinion of
experts, the opinions given by the expert witnesses may be regarded as conclusive only
if they are otherwise credible and free from contradiction and inconsistency. Lovewell's
testimony, at a minimum, diminished Howton's credibility and certainly contradicted both
Gilbert's and Howton's testimony regarding the cause of the horse's death. That being
said, the jury was free to draw its own conclusion based on the expert testimony before it
of the Gabriels' treatment and care of Lovewell's horse. 
          The testimony concerning the medications and the manner in which they were
administered is additional evidence the jury was entitled to consider. This evidence
included the testimony of the Gabriels' own experts that some of these medications have
the propensity to cause the very symptoms from which this filly died. Howton testified
Erythromycin is "very prone to cause diarrhea." Ron testified he administered this
antibiotic to the filly and, although he further testified he never administered antibiotics
without a veterinarian's prescription, both doctors, Gilbert and Howton, denied ordering this
medication. The Gabriels also gave this horse Banamine. Gilbert denied ordering
Banamine, and Howton said it is "possible" he ordered it. Howton testified that Banamine
can cause colitis and that veterinarian consultation before its use is vital, especially when
a horse is dehydrated. He said this special concern is due to the fact Banamine is
excreted through the kidneys and can, therefore, lead to renal problems. Uremia is one
of those complications and is one which this filly suffered. 
          Further, the Gabriels' records showed that no medications were administered to this
filly on Sunday, July 24, the day before the horse died. The jurors could reasonably infer
from this evidence that the Gabriels failed in part to follow Gilbert's instructions in their
treatment of the horse.
          Finally, the evidence showed that, even though Howton knew the filly was not
owned by the Gabriels, its body and a blood specimen taken from the horse were promptly
destroyed without Lovewell's knowledge or consent. This was done without a necropsy
having been performed and without an independent analysis of the blood specimen. The
jurors were entitled to consider this evidence, along with the long-standing business
relationship Howton had with the Gabriels, in drawing inferences that reasonably support
the verdict. 
          The jurors were entitled to consider all this evidence in light of their own general
experience and common sense and conclude that the Gabriels' acts or omissions were a
substantial factor in bringing about the injury (the death of the horse), without which acts
or omissions the harm would not have occurred. See Read, 990 S.W.2d at 737. Viewing
the evidence in a light most favorable to the verdict, we conclude it was legally sufficient
to support the jury's verdict.
          3.       Factually Sufficient Evidence
          The record reveals that the jury relied on Lovewell's testimony about his
conversation with Howton to some extent, as indicated by notes to the trial court during
deliberations. Additionally, we again note the record shows that Lana had taken the farm's
trailer out of town to a horse show for a few days and that the trailer was not there on
Saturday, July 24. Ron testified as to the availability of trailers at his property, indicating
that, even if the farm's trailer was being used, he had access to several owners' trailers left
on his property or he could have borrowed one from a neighbor. The jury, however, could
have disregarded this testimony. A jury is free to believe or disbelieve the testimony of any
witness, or any part of a witness' testimony. 
          Both veterinarians testified to the possible side effects of the drugs administered by
the Gabriels. In other words, their testimony established that the drugs have the propensity
to cause some of the ailments suffered by the horse. But they both also testified that the
drugs did not in this case. The veterinarians both testified the Gabriels did not cause the
death of the horse. However, as we previously concluded, the Gabriels' experts' testimony
on the cause of the filly's death was not conclusive on the matter. In light of Gregory and
West, the jury was free to disregard the veterinarians' trial conclusions. Considering all of
the evidence in a neutral light, we cannot conclude the jury's verdict was so against the
great weight and preponderance of the evidence as to be manifestly unjust. 
IV.      CONCLUSION
          In summary, the impact of the admission of Lovewell's testimony concerning his
conversation with Howton is at least two-fold. First, without having been limited before the
jury, the testimony carries full probative weight. This testimony, together with the other
evidence and its logical inferences, renders the evidence legally and factually sufficient to
support the jury's verdict in favor of Lovewell. Second, Lovewell's hearsay testimony
undermines the experts' testimony that the Gabriels' acts or omissions were not the cause
of the horse's death and, thus, eliminates the conclusive nature that the experts' testimony
likely would have had otherwise. For these reasons, we conclude the evidence is legally
and factually sufficient to support the jury's verdict. 
          We affirm the judgment.

                                                                Donald R. Ross
                                                                Justice


DISSENTING OPINION

          The central issue in this case is whether alleged acts of negligence by the Gabriels
caused the death of Lovewell's filly. Though Lovewell presented no expert testimony, the
majority nevertheless concludes the evidence is legally and factually sufficient to support
the jury's finding of negligence and proximate cause. The majority reaches this conclusion
after holding Lovewell was not required to present expert testimony on the issue of
causation. Because I disagree with that assessment of the law, I respectfully dissent.
          Lovewell's suit against the Gabriels alleged sixteen theories of negligence. A cause
of action for ordinary negligence requires a showing (1) that the defendant owed the
plaintiff a duty recognized by law, (2) that there was a breach of that duty, (3) that the
breach of the defendant's duty proximately caused injury to the plaintiff, and (4) that the
plaintiff suffered actual loss or damages as a result of the defendant's negligent conduct. 
Southwest Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 273–74 (Tex. 2002); Sunbridge
Healthcare Corp. v. Penny, No. 06-03-00124-CV, 2005 Tex. App. LEXIS 1887, at *26 (Tex.
App.—Texarkana Mar. 11, 2005, no pet.). "An essential element of the plaintiff's cause
of action for negligence, or for that matter for any other tort, is that there be some
reasonable connection between the act or omission of the defendant and the damage
which the plaintiff has suffered. Prosser, Law of Torts (3rd Ed.) 240–241, 'Causation', 41
(1964)." E. Tex. Theatres, Inc. v. Rutledge, 453 S.W.2d 466, 468 (Tex. 1970).
          Lovewell alleged that the Gabriels committed acts or omissions that proximately
caused the death of the horse. Therefore, proof of the cause of the death of the horse was
required. The majority opinion states that the circumstances surrounding the cause of the
filly's death were matters within the jury's common understanding. In this case, the
evidence shows that the horse died from renal failure due to complications from
endotoxemia resulting from Colitis X. May a jury make the determination, without expert
testimony, that the actions or omissions of the Gabriels were the cause in fact of the horse
contracting Colitis X causing endotoxemia and renal failure and ultimately death? The
veterinarians testified that no act or omissions of the Gabriels caused the death of the
horse. It is undisputed that there are many causes of Colitis X. The Texas Supreme Court
has stated: 
In determining the question of proximate cause, the general rule is "that
proof of causation must be beyond a showing of a possibility that the injuries
arose from the defendant's negligence or lack of skill, since the jury will not
be permitted to speculate as to the cause of the injury. Thus where the
evidence most favorably to the plaintiff develops more than one equally
probable cause, for one or more of which defendant is not responsible, the
plaintiff has failed to sustain his burden of proof."

Hart v. Van Zandt, 399 S.W.2d 791, 792–93 (Tex. 1965) (quoting 13 A.L.R.2d 22)
(superseded by statute on other grounds, see Peterson v. Shields, 652 S.W.2d 929, 930
(Tex. 1983)). 
          Though not precisely on point, a recent decision by the Second Court of Appeals
supports the Gabriels' position that Lovewell was required to present expert testimony at
trial regarding causation. In McGee v. Smith, a horse owner sued a veterinarian for
negligent care that allegedly led to the death of a foal. 107 S.W.3d 725, 726–27 (Tex.
App.—Fort Worth 2003, pet. denied). The horse owner offered no expert testimony at trial
on the element of causation. Id. at 727. Instead, the owner "relied on his own testimony
and that of his father-in-law. Although both men had been involved in the horse industry
for many years, neither was qualified as an expert in veterinary medicine." Id. The court
of appeals wrote that veterinary malpractice cases, like medical malpractice cases, require
the plaintiff to provide expert testimony to prove causation "unless the form or mode of
treatment is a matter of common knowledge, or the matter is within the experience of a
layperson." Id. The McGee court ultimately held the dearth of expert evidence on behalf
of the plaintiff's case was insufficient to support the jury's verdict. Id. at 728. The court
then reversed the trial court's judgment and rendered a take-nothing judgment for the
veterinarian. Id.
          Given the facts of this case—the array of drugs (Rebound, Naxcell, Erythromycin,
Banamine, Ampicillin, and Gentamicin) that had been recently administered to the horse,
the side effects of those drugs to create or exacerbate other life-threatening illnesses, the
short onset of death (less than one week passed from the onset of symptoms until the
filly's death), the complex nature of the disease, and the treatment by multiple veterinarians
and other care providers—I believe that understanding the proximate cause of the filly's
death would be outside the purview of a layperson's common knowledge or experience. 
Jurors do not commonly have experience in diagnosing the cause of a disease or ailment,
especially in equines. Without expert testimony, the jury must engage in speculation to
conclude that the actions of the Gabriels proximately caused the death of the horse. Even
if there is evidence of the Gabriels' negligence, there must be a connection between the
negligence and the death of the animal. In cases involving the diagnosis and progression
of a disease leading to death, that connecting link is supplied by expert testimony. See Ins.
Co. of N. Am. v. Myers, 411 S.W.2d 710, 713 (Tex. 1966); Tex. Employers Ins. Ass'n v.
Gallegos, 415 S.W.2d 708, 711 (Tex. App.—San Antonio 1967, no writ). I believe the
causal nexus between the alleged acts of negligence and the death of the filly should have
been established and supported by expert testimony presented during Lovewell's case-in-chief. 
          Though this is not a malpractice case, the facts and issues are more than
sufficiently akin to the complex area of veterinary science that I believe similar expert
testimony was essential to aid the jury. I do not believe there is any probative evidence to
support the jury's finding on causation and, therefore, the case should be reversed and
rendered.
 
                                                                           Jack Carter
                                                                           Justice

Date Submitted:      March 17, 2005
Date Decided:         May 26, 2005